**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| DEEDRA K. GIPSON,      ) | |
|                     ) | |
|      Plaintiff,      ) | |
|                     ) | |
|      vs.      ) | **Case number 2:13cv0024 TCM** |
|                     ) | |
| CAROLYN W. COLVIN, Acting      ) | |
| Commissioner of Social Security,      ) | |
|                     ) | |
|      Defendant.      ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the

applications of Deedra Gibson for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income

("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for

a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Ms. Gibson (Plaintiff) applied for DIB and SSI in September 2010, alleging she was

disabled as of May 28, 2009, because of right leg numbness, bone pain, and fibromyalgia.

(R.[1] at 130-40, 172.) Her applications were denied initially and following a January 2012

hearing before Administrative Law Judge ("ALJ") Ross Stubblefield. (Id. at 7-18, 23-60, 67-

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

71.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (<u>Id.</u> at 1-3)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Chad E. Jones, M.S., C.R.C., N.C.C., L.P.C., testified at the administrative hearing.

Plaintiff, forty-four years old at the time of the hearing, testified she is 5 feet 2 inches tall and weighs 210 pounds.  (<u>Id.</u> at 29.)  In the past few years, she has gained 50 pounds.  (<u>Id.</u> at 29-30.)  She is right-handed, divorced for eighteen years, and lives in a house with her boyfriend.  (<u>Id.</u> at 30.)  She gets food stamps and is on Medicaid.  (<u>Id.</u> at 32.)  Her boyfriend supports her.  (<u>Id.</u>)  She has a driver's license.  (<u>Id.</u> at 30.)  She went as far as the seventh grade in school.  (<u>Id.</u> at 31.)  She tried to get a General Equivalency Degree ("GED"), but dropped out.  (<u>Id.</u> at 31-32.)  She does not have any vocational training.  (<u>Id.</u> at 32.)

Plaintiff testified she last worked in a cake factory.  (<u>Id.</u> at 33.)  This job ended the day before she had her decompression surgery on both hips.  (<u>Id.</u>)  The surgery did not help the pain in her right hip, but did in her left.  (<u>Id.</u> at 33-34.)  She later had a total replacement of the right hip.  (<u>Id.</u> at 35.)  She continues to have pain in that hip and uses a cane.  (<u>Id.</u>)  The pain is constant, but varies in intensity.  (<u>Id.</u> at 37.)  It is made worse by standing and walking.  (<u>Id.</u>)  And, it is worse after the surgery.  (<u>Id.</u> at 45.)  Also, the pain affects her sleep because she is constantly moving about trying to get comfortable.  (<u>Id.</u> at 37-38.)  At most, she gets two hours of sleep a night.  (<u>Id.</u> at 38.)  She dozes during the day because she is

tired.  (Id. at 39.)  And, because her legs are not the same length, she has lower back pain and has to wear shoes with lifts.  (Id. at 39-40.)

Plaintiff's boyfriend helps her with household chores.  (Id. at 38.)  She does not like to get out because it is painful and people gawk at her.  (Id.)

A couple of times a week, her right leg goes numb and she cannot move for five to twenty minutes.  (Id. at 40-41.)  Her doctor has given her exercises to try to help, but they don't.  (Id. at 42.)  She cannot walk as far as half a block.  (Id.)

Her grandson comes to her house in the morning before getting on the school bus in front of her house.  (Id. at 43-44.)

Because of her hip pain and the resulting complications, Plaintiff has had to get rid of her pets and no longer enjoys her former hobbies of fishing, horseback riding, and gardening. (Id. at 44-45.)  She takes Paxil for depression.  (Id. at 45.)

Plaintiff uses an oxygen machine at night.  (Id. at 46-47.)

Mr. Jones, testifying as a vocational expert ("VE"), was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who is limited to sedentary work and to occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 54.)  This claimant cannot climb ropes, ladders, or scaffolds.  (Id.) Mr. Jones stated that this claimant cannot perform any of Plaintiff's past relevant work but can perform other jobs existing in the national economy.  (Id. at 54-55.)  For instance, she can work as a final assembler of optical goods, a dowel inspector, and a hand mounter.  (Id. at 55.)  These are all unskilled, sedentary jobs existing in significant numbers in the state and

national economies.  (Id.)  If this hypothetical claimant needs an unscheduled break lasting between twenty minutes and two hours during an eight-hour shift, all work will be precluded. (Id. at 56.)

Mr. Jones further stated that his testimony is consistent with the *Dictionary of Occupational Titles* ("DOT").

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and an assessment of her physical functional capacity.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 171-11.)  She was then 5 feet 2 inches tall and weighed 180 pounds.  (Id. at 172.)  Her impairments, see page one, supra, prevented her from working as of May 27, 2009. (Id.)  The highest grade she completed was the sixth grade.  (Id.)  She had not been in special education classes.  (Id. at 173.)  She takes gabapentin for her fibromyalgia.  (Id. at 174.)

On a Function Report, Plaintiff described what she does during the day.  (Id. at 163.) She showers, if she feels like it; eats breakfast; takes gabapentin; does a little housework; watches television, reads, or does crafts; eats lunch; does a little housework; watches television, reads, does crafts or puzzles; cooks supper and eats; washes dishes; and watches television.  (Id.)  She feeds and waters two dogs; her daughter bathes them.  (Id. at 164.)  She takes her mother to the grocery store.  (Id.)  Her sleep is adversely affected by her pain.  (Id.) She has to sit down to put on her pants, shoes, and socks; has to shower because she cannot

get out of a tub; and frequently has to use the microwave when cooking.  (Id.)  Her daughter helps her with the laundry, does the vacuuming, and mows the lawn.  (Id.)  She goes to church once a week.  (Id. at 167.)  Her impairments adversely affect her abilities to lift, climb stairs, squat, kneel, bend, stand, walk, and complete tasks.  (Id. at 168.)  They do not affect her abilities to, among other things, sit, follow instructions, or concentrate.  (Id.)  She cannot lift anything heavier than twenty pounds, cannot stand for longer than two hours, cannot walk farther than one-half block before having to stop and rest for twenty to thirty minutes; and cannot climb more than three steps.  (Id.)  She does not handle stress well and does not like changes in routine.  (Id. at 169.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (Id. at 182-86.)  Since filing the original report, she has had no new impairments or new symptoms or limitations.  (Id. at 182.)  Nor have her impairments changed for the better or the worse.  (Id.)  Her only medication is gabapentin.  (Id. at 183.)  On an undated list of medications, Plaintiff also included Neurontin (a brand name for gabapentin),  paroxetine (an antidepressant), and a Combivent inhaler (for asthma, chronic bronchitis, and emphysema).  (Id. at 190.)

In the fifteen years prior to filing her applications, Plaintiff had reportable earnings every year but 1998 and 1999.  (Id. at 129.)  Those earnings included $11,275[2] (her highest earnings) in 2007; $2,322 in 2008; and $479 in 2009.  (Id.)

_____

[2]All amounts are rounded to the nearest dollar.

The relevant medical records[3] before the ALJ are summarized below in chronological order and begin in April 2009 when Plaintiff was seen by Rebekah Hudson, PA-C (Certified Physician Assistant), with Mexico Family Medicine for complaints of intermittent right hip pain for the past four months that had increased in severity during the past several weeks. (Id. at 199.)  Ibuprofen had given only slight relief.  (Id.)  On examination, she walked with a light antalgic gait.  (Id.)  Her right hip was not tender on palpation, but Plaintiff pointed to the hip as an area of discomfort.  (Id.)  She had a "[f]ull range of motion in the hip with increased discomfort particularly with internal/external rotation and flexion."  (Id.)  She was to increase her dosage of ibuprofen, to have an x-ray of the hip and pelvis, and to return if her symptoms did not improve in the next seven to ten days.  (Id.)

A few weeks later, Plaintiff saw Richard A. White with the orthopedic clinic ("the Clinic) at University of Missouri – Columbia Hospital for right hip pain and popping in her anterior groin for the past four months.  (Id. at 368-70, 416-18.)  Ibuprofen, naprosyn, and rest did not provide any relief; soaking in a hot tub provided some relief.  (Id. at 369.)  The pain had "started when she was working, moving and babysitting her grandson."  (Id.)  She smoked a pack of cigarettes a day.  (Id.)  On examination, she reported pain with flexion of her right hip.  (Id.)  Flexion was to 110 degrees; external rotation was to 40 degrees, although with pain in her anterior groin; internal rotation was to 15 degrees; and abduction was to 45 degrees.  (Id.)  She reported pain when her iliopsoas was stretched.  (Id. at 370.)  X-rays of

---

[3]Medical records relating to treatment for such problems as sore throats, urinary problems, and a 2008 right shoulder injury are summarized only to the extent they are relevant to Plaintiff's alleged disabling impairments.

her pelvis and right hip showed no fracture, dislocation or significant bony abnormalities. (Id.) There was an area in which there might be avascular necrosis ("AVN") and "a slight bump on the femoral head which could be consistent with impingement." (Id.) A magnetic resonance imaging ("MRI") of her right hip was to be performed to determine if AVN could be ruled out. (Id.) The MRI revealed AVN of both femoral heads, with the right worse than the left. (Id. at 366-67, 414.) After discussion with Dr. White, Plaintiff elected to proceed with a bilateral hip core decompression with fibular strut grafting. (Id. at 367, 411-12.) This was performed on May 28 at the Audrain Medical Center. (Id. at 363-65, 386-407, 409.)

On June 9, Plaintiff saw Carrie Ann Lucas, A.P.R.N. (Advanced Practice Registered Nurse), at the Clinic for a follow-up appointment. (Id. at 358-62.) She reported having no pain, but slight discomfort. (Id. at 358.) As instructed, she had not been weight-bearing. (Id.) On examination, Plaintiff was able to forward flex in both hips to about 90 degrees, externally rotate to 35 degrees, and internally rotate, with some pain, to approximately 5 degrees. (Id. at 359.) She was to work on her range of motion in both hips, but was to continue not to bear weight for another four and one-half weeks. (Id.) She was to return at that time. (Id.) X-rays taken following her appointment revealed no acute findings. (Id. at 360-62, 382-84.) There were linear sclerotic lesions in both femoral heads that were likely to be post-surgical changes. (Id.)

When next seeing Ms. Lucas, on July 9, Plaintiff reported she was continuing to have "quite a bit of pain especially in the right hip" and an occasional burning sensation in the left hip if she walked on it for a while. (Id. at 356-57, 379-80.) She had not done any physical

therapy, but was walking. (Id. at 356.) On examination of the left hip, she had flexion to 110 degrees, external rotation to 35 degrees, internal rotation to 15 degrees, abduction to 35 degrees, and adduction to 5 degrees. (Id.) She could do one straight leg raise "without much difficulty." (Id.) On examination of her right hip, she had flexion to approximately 90 degrees, external rotation to 30 degrees, internal rotation to 15 degrees, and "a very difficult time doing 1 straight leg raise." (Id.) X-rays showed changes consistent with the bilateral hip core decompression, but no increased femoral collapse. (Id. at 357.) Formal physical therapy was discussed, as were stretching and range of motion exercises for her hips and straight leg raises. (Id.) She was to return in one month. (Id.)

Plaintiff saw Dr. White in August. (Id. at 354-55, 376-77.) They discussed a steroid injection and, if necessary, a hip replacement. (Id. at 354.) She proceeded with the injection. (Id. at 355.)

In November, Plaintiff met with Bhajanjit S. Bal, M.D., at the Clinic. (Id. at 348-53.) Her range of motion in her right hip was limited to zero degrees on internal rotation. (Id. at 349.) She could not put on shoes or socks, and could not function. (Id.) She had quit her job as a factory worker. (Id.) It was decided she would have a total right hip replacement. (Id.) Dr. Bal doubted she would need a left hip replacement, but noted that Plaintiff should remember there was such a possibility. (Id.)

Plaintiff was admitted on February 11, 2010, to Columbia Regional Hospital for a total right hip replacement. (Id. at 208-34, 243-69, 274-340, 343-45.) Her diagnosis was AVN of both hips. (Id. at 232.) Her current medical problems included chronic obstructive

pulmonary disease (COPD), hypertension, and sleep apnea. (Id. at 223.) In a pre-surgery evaluation, it was reported that the chronic hypertension had begun several years earlier, was mild, and did not require medication. (Id. at 235.) The COPD had also begun several years earlier and was of mild to moderate severity. (Id.) Plaintiff was a smoker and did not want to quit. (Id.) She could walk several blocks and climb two flights of stairs without respiratory discomfort, but was limited by hip pain. (Id.) At discharge on February 14, she was described as "doing very well." (Id. at 234.) Her leg lengths were equal. (Id.) It was noted she was "ambulating independently with a walker" and no other assistance. (Id. at 232.) Plaintiff was to return in one month. (Id.)

Plaintiff did. (Id. at 270-73.) X-rays of the right hip showed no evidence of hardware failure, no abnormal area of lucency, and a decrease in the surrounding edema. (Id. at 272-73.) An x-ray of the left hip joint showed mild degenerative changes. (Id.) Dr. Bal noted that, as he expected, Plaintiff's right leg was longer. (Id. at 270.) It was made longer for stability. (Id.) He was "not overly concerned with the offset because [Plaintiff] does not have much pain in that hip and she is ambulatory. The opposite hip furthermore is bad, with a bone graft and is hurting." (Id.) The left hip would have to be replaced "[a]t some point," at which time the leg lengths could be balanced. (Id.) She was to return in six weeks. (Id.) She was taking oxycodone (an opioid pain medication) at night. (Id. at 271.)

In May, Plaintiff consulted Robert Jackson, D.O., with the Audrain Medical Center Rheumatology Clinic for evaluation of chronic fibromyalgia, symptoms of which had been present for eight to ten years and had become worse as a result of the right hip replacement.

(Id. at 372-74.)  She had not taken any traditional fibromyalgia medications.  (Id. at 372.)  Her current medications were a multivitamin, an omega III supplement, a calcium tablet, and ibuprofen.  (Id.)  She also reported having restless leg syndrome.  (Id.)  On examination, she had diffuse myofascial trigger points of her extremities, back, and torso, consistent with fibromyalgia.  (Id. at 373.)  She had no focal or motor sensory deficits and no tremor, clonus, or ataxia.  (Id.)  Dr. Jackson's diagnoses were diffuse chronic fibromyalgia complicated by AVN of her hips and status post right hip replacement; premature menopause; and restless leg syndrome.  (Id.)  He started her on Savella for the fibromyalgia and Klonopin for the restless leg syndrome.  (Id.)  A lab panel, including a complete blood count, was to be drawn.  (Id.)  She was to return in four to six weeks.  (Id.)

On September 29, Plaintiff saw Justin Jones, M.D., with Mexico Family Medicine about a cough and sinus drainage for the past six days.  (Id. at 441.)  She reported she was still having problems with her right hip.  (Id. at 441.)  She was prescribed Avelox, prednisone, and a Combivent inhaler for her bronchitis and upper respiratory infection.  (Id.)  Dr. Jones strongly recommended she stop smoking.  (Id.)

Plaintiff returned to Dr. Jones one week later, reporting she was continuing to have a lot of sinus drainage.  (Id. at 439-40.)  The dosage of prednisone was increased; Bactrim was added.  (Id.)  She was given a "[l]ong lecture" about quitting smoking.  (Id. at 439.)  She reported she had an appointment later that month for smoking cessation counseling.  (Id.)  Chest x-rays taken that day revealed cardiomegaly (an enlarged heart) and a subcarinal

density thought to be a calcified lymph nodal mass, likely benign.  (Id. at 453.)  No heart failure or acute infiltrates were revealed.  (Id.)

Plaintiff consulted Steven Taylor, M.D., in June 2011 for complaints of back pain and night sweats.  (Id. at 450-51.)  She had had right hip replacement surgery two years earlier and had quit smoking three weeks earlier.  (Id. at 450.)  Her right hip would lock if in a certain position.  (Id.) Her weight was 212 pounds.  (Id.)  Dr. Taylor assessed Plaintiff as being menopausal and having insomnia, obesity, and right hip pain despite having undergone a total right hip replacement two years earlier.  (Id. at 451.)  A sleep study was to be done to determine whether she had sleep apnea.  (Id.)  She was to see an orthopedist and go on a low fat diet.  (Id.)

Three weeks later, Plaintiff under went an overnight polysomnography performed by N. Eugene Thomas, D.O.  (Id. at 452, 454.)  She showed no evidence of significant obstructive sleep apnea.  (Id. at 454.) She did have desaturations, for which nocturnal oxygen was recommended.  (Id.)

Plaintiff returned to Dr. Taylor on July 13.  (Id. at 448-49.)  She had lost two and one-half pounds.  (Id. at 448-49.)  Her diagnoses included nocturnal desaturations, obesity, and lactose intolerance.  (Id. at 449.)  She was to walk daily and continue using oxygen at night.  (Id.)  She was prescribed Paxil, which she reported helped decrease her hot flashes.  (Id. at 448, 449.)

One week later, Plaintiff telephoned Dr. Taylor to request a prescription for a cane.  (Id. at 447.)  One was prescribed.  (Id. at 437.)

Plaintiff next saw Dr. Taylor in October. (Id. at 446.) She had fractured her left wrist in a fall. (Id.) On November 1, she reported the wrist pain had resolved. (Id. at 445.) She had a good range of motion in the wrist. (Id.) She further reported that gabapentin helped her fibromyalgia. (Id.) She weighed 205.5 pounds. (Id.)

In January 2012, Plaintiff saw Dr. Taylor for complaints of scalp furuncles (a bacterial or fungal infection of a hair follicle). (Id. at 443-44.) She was prescribed Keflex (an antibiotic prescribed to fight bacteria in the body). (Id. at 444.) It was noted she was no longer taking Ultram for her hip pain. (Id.) Her weight was 211 pounds. (Id. at 443.)

Also before the ALJ was an assessment of Plaintiff's physical residual functional capacity and an opinion as to whether she satisfies Listing 1.03.

In October 2010, a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff was completed by Evie Knapp, a single decision maker.[4] (Id. at 61-66.) The primary diagnosis was a total right hip replacement due to AVN; the secondary diagnoses were fibromyalgia and obesity. (Id. at 61.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for approximately two hours in an eight-hour day; and sit for approximately six hours during that period. (Id. at 62.) Her ability to push and pull in her lower extremities was limited. (Id.) She had postural limitations of never climbing ladders, ropes, and scaffolds and only occasionally balancing, stooping, kneeling, crouching,

---

[4]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

crawling, and climbing ramps and stairs. (Id. at 63.) She had no manipulative, visual, or communicative limitations. (Id. at 63-64.) She had environmental limitations of needing to avoid concentrated exposure to extreme cold, vibrations, and fumes and other airborne irritants. (Id. at 64.)

In January 2011, Dr. Bal marked "Yes" in response to the question whether Plaintiff's condition satisfied Listing 1.03. (Id. at 435.) The Listing and the definition of inability to ambulate effectively were included on the form, and read as follows.

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.03.

> An inability to ambulate effectively is defined as:
>
> [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk

independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

<u>Id.</u> § 1.00(B)(2)(b)(1) and (2).

## **The ALJ's Decision**

The ALJ first determined that Plaintiff met the insured status of the Act through December 31, 2012, and has not engaged in substantial gainful activity since her alleged onset date of May 28, 2009.  (<u>Id.</u> at 12.)  The ALJ next found that Plaintiff has severe impairments of fibromyalgia, unequal leg length, obesity, and hip pain status post bilateral hip surgeries.  (<u>Id.</u>)  She also has nonsevere impairments of hypertension, sleep apnea, and COPD.  (<u>Id.</u>)  He noted Plaintiff's testimony she suffers from, and is being treated for, depression, but also noted that her prescription for Paxil was written in conjunction with menopausal symptoms and not depression.  (<u>Id.</u> at 13.)  Nor was there any formal diagnosis of, or treatment for, depression.  (<u>Id.</u>)

The ALJ concluded that Plaintiff's impairments do not, singly or combined, meet or medically equal an impairment of listing-level severity, including Listing 1.03.  (<u>Id.</u>)  He declined to give Dr. Bal's opinion that she satisfies Listing 1.03 any weight as it is unaccompanied by any supporting narrative explanation or by any reference to objective medical evidence, and is inconsistent with the objective medical evidence.  (<u>Id.</u> at 14.)  Her fibromyalgia did not satisfy the only applicable listing, Listing 1.00.  (<u>Id.</u>)  The ALJ considered the effects of her obesity on her ability to function, but found the obesity was not equivalent to any Listing.  (<u>Id.</u>)

The ALJ decided that, with her impairments, Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with additional limitations of (1) only occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs and (2) no climbing of ropes, ladders, or scaffolds. (<u>Id.</u>) When assessing Plaintiff's RFC, the ALJ found her not to be fully credible when describing the effects of her symptoms. (<u>Id.</u> at 15.) He noted that those effects are not supported by the objective medical record and are inconsistent with her activities of daily living. (<u>Id.</u>) Plaintiff has not sought medical treatment for her hip condition since mid-2010 and hip pain was only mentioned in passing in subsequent medical records. (<u>Id.</u>) Her fibromyalgia symptoms appear to be well controlled with medication. (<u>Id.</u> at 16.) And, although there is no medical evidence to show Plaintiff is limited by obesity, his RFC findings assumed it has some effect on her ability to do sustained work. (<u>Id.</u>)

The ALJ concluded that with her RFC, Plaintiff is unable to perform past relevant work. (<u>Id.</u> at 17.) With her age, marginal education, work experience, and RFC, she can, however, perform jobs as described by the VE. (<u>Id.</u> at 17-18.) Consequently, she is not disabled within the meaning of the Act. (<u>Id.</u> at 18.)

<u>**Standards of Review**</u>

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only

the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.

See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to

decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218).  After considering the

<u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the

inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Ford**

**v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir.

2000).

At step four, the ALJ determines whether claimant can return to her past relevant

work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step

four remains with the claimant to prove her RFC and establish she cannot return to her past

relevant work.  **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th

Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant

cannot return to past relevant work, the burden shifts at step five to the Commissioner to

establish the claimant maintains the RFC to perform a significant number of jobs within the

national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v.**

**Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f),

416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE,

**Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments

supported by substantial evidence on the record and accepted as true and capture the concrete

consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010)

(quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ erred by (1) disregarding Dr. Bal's opinion that she satisfies Listing 1.03; (2) not finding that her sleep apnea/insomnia are severe impairments;

(3) not properly considering the effect of her obesity on her ability to work; and (4) not including all her medically-established restrictions in the RFC he used to question the VE.

Dr. Bal's Opinion.   Plaintiff correctly notes that Dr. Bal is one of her treating physicians and that he opined that she satisfies Listing 1.03.  This opinion was expressed by marking the line next to "Yes" in response to a question whether she did so.  This opinion was rendered in January 2011, ten months after Plaintiff last saw Dr. Bal.  The last visit was for a follow-up of her surgery for a total right hip replacement.  At that time, Plaintiff had little pain in the right hip and was ambulatory.  Dr. Bal predicted her left hip would have to be replaced at some point, but Plaintiff did not return in six weeks as he instructed, nor is there any indication in the record she sought a renewal of her prescription of the pain medication she was then taking.  Moreover, there is no explanation of why Dr. Bal opined ten months later that Plaintiff could not effectively ambulate.  "[A] conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little or no elaboration.'" **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)).  See also **Johnson v. Astrue**, 628 F.3d 991, 994 (8th Cir. 2011) (finding that an ALJ may properly reject treating physician's opinion consisting only of checkmarks).  The inclusion on the form of the definition of Listing 1.03 and of effectively ambulation does provide the necessary elaboration for Dr. Bal's opinion.

Sleep Apnea/Insomnia.   Plaintiff testified she sleeps two hours a night, at most. Plaintiff was diagnosed with insomnia in June 2011 by Dr. Taylor, a doctor she was seeing

for the first time.[5]  He ordered a sleep study.  One was done, revealing that Plaintiff did not have significant sleep apnea.  Dr. Taylor recommended she use oxygen at night.  She did not complain thereafter of insomnia.  And, when applying for DIB and SSI, she did not cite either sleep apnea or insomnia as a disabling impairment.[6]

An impairment "is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  The burden of proof is on the claimant to establish an impairment is severe.  **Bowen v. Yuckert**, 482 U.S. 137, 146 n.5 (1987); **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  It is not an onerous requirement, "but it is also not a toothless standard."  **Id.**  The paucity of complaints by Plaintiff to health care providers of difficulties sleeping reflect that any such problems did not significantly limit her abilities to do work activities.

Obesity.  Plaintiff next argues that the ALJ erred by not considering the effect her obesity has on her ability to work.  The ALJ found her obesity to be a severe impairment and, citing Social Security Ruling 02-1p, stated that he had considered the effects of that obesity on her ability function.  See S.S.R. 02-01p, 2000 WL 628049, *4 (S.S.A. Sept. 12, 2002) (Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.").  See also 20 C.F.R. Pt.

_____

[5]It cannot be determined from the checklist format of Dr. Taylor's notes whether Plaintiff complained of insomnia at this visit.  The notes simply read that sleep apnea was suspected.

[6]As noted, Plaintiff did testify about insomnia.  Her testimony, however, was found by the ALJ not to be credible – a finding unchallenged by Plaintiff.

404, Subpart P, Appx. 1, § 1.00(Q) ("[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.").  He determined she could perform sedentary work with additional limitations of (1) only occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs and (2) no climbing of ropes, ladders, or scaffolds.  "Sedentary work involves lifting no more than 10 pounds at time . . . .  Job are sedentary if walking and standing are required occasionally . . . ."  20 C.F.R. §§ 404.1567(a), 416.927(a).  Sedentary work requires less walking and standing than the next exertional level of light work.  See 20 C.F.R. §§ 404.1567(a), (b); 416.927(a), (b).

In **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013), the Eighth Circuit Court of Appeals rejected an argument that the ALJ had erred by failing to consider the claimant's obesity and breathing limitations when determining the claimant's RFC.  As in the instant case, the ALJ had included obesity among the claimant's severe impairments.  **Id.** at 523.  His RFC determination limited the amount of weight the claimant could lift and the length of time during an eight-hour day when she could stand and walk.  **Id.** at 526.  In **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009), the Eighth Circuit recognized its previous holding "that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."  The court then rejected the claimant's argument that the ALJ had failed to consider her obesity when determining her RFC.  **Id.**

In the instant case, the ALJ found Plaintiff's obesity to be a severe impairment; cited Social Security Ruling 02-1p; limited her to sedentary work, which restricts the amount of weight she can lift and the frequency of walking and standing; and also limited the frequency of other exertional activities, e.g., occasional crouching and no climbing of ropes. This is sufficient to avoid reversal. See **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. 2011) (finding that ALJ properly considered claimant's obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing); **Yarbrough v. Astrue**, 2012 WL 3235747, *3-4 (E.D. Ark. 2012) (finding that ALJ's citation to Social Security Ruling 02-1p, his statement that he had to consider at step three whether the combination of claimant's impairments satisfied a listing, and summary of alleged impairments, including obesity, satisfied requirement that ALJ consider combined effect of impairments, including obesity).

The Hypothetical to the VE. Plaintiff further argues that the ALJ erred by not including in the RFC expressed in his hypothetical question to the VE her inability to ambulate effectively, as evidenced by Dr. Bal's opinion and her need for a cane.

"'[T]he ALJ's hypothetical question [to the VE] must include those requirements that the ALJ finds are substantially supported by the record as a whole.'" **Buckner v. Astrue**, 646 F.3d 549, 561 (8th Cir. 2011) (quoting Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)). "'[A]n ALJ may omit alleged impairments from a hypothetical question posed to a [VE] when [t]here is no medical evidence that these conditions impose any restrictions on [the claimant's]

functional capabilities.'" **Id.** (quoting Owen v. Astrue, 551 F.3d 792, 801-02 (8th Cir. 2008)) (third and fourth alterations in original).

The lack of support for Dr. Bal's opinion is discussed above. Plaintiff argues that "there is . . . evidence that [she] requires the use of a cane for ambulation," but the ALJ failed to include such in his hypothetical question to the VE or in his RFC findings. (Pl.'s Br. at 15, ECF No. 21.) The evidence cited by Plaintiff is Dr. Taylor's prescription of a cane.[7] The record reveals, however, that the prescription was made at Plaintiff's request and not as a result of any independent medical judgment of Dr. Taylor. Moreover, the ALJ's limitation in his RFC findings and in his hypothetical question to sedentary work does accommodate a restricted ability to walk and stand.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

_____

[7]Plaintiff cites page 439 of the Record in support of her argument. This is Dr. Jones' notes of an October 2010 visit for complaints of coughing and sinus drainage. There is no reference to Plaintiff's use of a cane. Page 437 of the Record is a copy of Dr. Taylor's prescription for a cane. The Court assumes this is the intended citation.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  11th  day of March, 2014.